UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

**DECISION AND ORDER**
12-CR-45S

v.

SHANE GRAFMAN,

Defendant.

## I.    INTRODUCTION

Pending before the Court is a motion (Dkt. No. 44) by defendant Shane

Grafman for release on reasonable bail conditions.  Defendant has been in

custody since arraignment on February 13, 2012.  In support of his motion,

defendant has submitted a proposed bail package and six reasons why that

package will suffice to secure future appearances and the safety of the

community: "(1) Mr. Grafman's mother, father, step-mother, and aunt all plan to

appear in court on his behalf and offer to sign a bond secured by $436,000 worth

of assets; (2) Mr. Grafman is very close with his family and has tremendous

support from them to make sure he abides by the conditions set upon him and

returns to court; (3) Mr. Grafman has been self-sufficient since age 18, and is fully

responsible for his rent and other monthly expenses; (4) Mr. Grafman has

substantial ties to Phoenix, where he would be under home detention, and thus

does not pose a flight risk; (5) Mr. Grafman's ties to both Arizona and New York

have grown deeper because of his commitment to his faith; [and] (6) Mr.
Grafman's criminal history is unremarkable, he has a consistent appearance
record, and he has been cooperative throughout this case."  (Dkt. No. 46 at 4.)

The Government opposes defendant's motion.  The Government cites to
numerous inconsistencies between the information that defendant provided to the
United States Probation Office ("USPO") and the information that it obtained on
its own during its investigation, with respect to defendant's background.  The
Government also asserts that defendant has glossed over significant evidence
linking him to a multimillion dollar drug operation; numerous drug shipments
including packages of marijuana weighing in the hundreds of pounds; and
numerous cash transactions that at best indicate a quirky desire to avoid
documentation and at worst demonstrate the life of a large-scale drug dealer who
needs to avoid documentation.  The USPO recommends continued detention.

The Court held oral argument on July 6, 2012.  For the reasons below, the
Court denies defendant's motion.

## II.   BACKGROUND

This case concerns allegations that defendant helped coordinate a
multimillion dollar drug operation that shipped hundreds of pounds of marijuana
from Arizona to Western New York and that also dealt in cocaine.  On February
1, 2012, the Court signed a pre-indictment complaint (Dkt. No. 1) whose
supporting affidavit set forth, *inter alia*, details of numerous mail packages

2

shipped between Arizona and Western New York or planned for shipment.  The

shipped and planned packages allegedly contained hundreds of pounds of

marijuana.  The papers accompanying the complaint also contained the first

mention in this case of an unusual seizure involving defendant that occurred on

February 3, 2010.  On that date, defendant and a passenger allegedly were

driving through the state of Oklahoma, on their way to Arizona, in a Honda

Ridgeline pickup truck.  An Oklahoma state trooper stopped the truck because of

an unspecified traffic violation.  The trooper obtained consent to search the truck

and found a secret compartment in the cab that defendant initially denied

knowing existed.  Inside the compartment, the trooper found $671,385 in cash.

Defendant denied ownership of the cash but also admitted to being in Niagara

Falls, New York prior to driving back to Arizona.  On the basis of the above

information plus other details in the supporting papers, the Court found probable

cause to sign the complaint and the accompanying arrest warrant.

On February 2, 2012, the day after the issuance of the complaint, the

Government filed a two-count indictment against defendant and others.  In Count

One, the Government asserted that defendant "did knowingly, willfully and

unlawfully combine, conspire and agree together and with others, known and

unknown, to commit the following offenses, that is, to possess with the intent to

distribute, and to distribute, five (5) kilograms or more of a mixture and substance

containing cocaine, a Schedule II controlled substance, and one hundred (100)

3

kilograms or more of a mixture and substance containing marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 841(b)(1)(B).  All in violation of Title 21, United States Code, Section 846." (Dkt. No. 2 at 1–2.)  In Count Two, the Government accused defendant of money laundering in violation of 18 U.S.C. § 1956(h).  The indictment also contained a forfeiture allegation in which the Government seeks forfeiture of over $2 million in cash from all of the defendants.

The Court held several initial proceedings regarding the issue of detention. At arraignment on February 13, 2012, the Government moved for detention; the Court granted temporary detention until a hearing the next day.  On February 14, 2012, defendant's prior counsel opposed detention and proposed conditions of release including a $100,000 bond.  The Court directed the USPO to verify a residence that defendant proposed and directed defendant to prepare more information about his assets, because $100,000 would not suffice if the Court granted bail.  When the detention proceedings returned before the Court on February 28, 2012, defendant changed attorneys.  New counsel, who prepared the pending bail motion, requested more time to prepare a bail package and waived immediate detention proceedings with the right to revisit detention later. Based on the pretrial services report of February 13, 2012, which included defendant's history of prior bench warrants and prior criminal offenses, the Court ordered defendant detained without prejudice.

4

On June 11, 2012, defendant filed the pending motion for bail. Defendant makes several arguments supporting his proposed combination of conditions of release. Defendant offers detailed financial information about real property and retirement funds, having a value of $436,000, that his family is willing to post for bail. Defendant asserts that he is close to his family and that both of his parents have strong ties to Buffalo because they attended and graduated from Buffalo State College between 1969 and 1973. Defendant points to his history as "a successful businessman and entrepreneur," (Dkt. No. 46 at 7) which consists of time in Arizona as a membership sales representative for Bally Total Fitness; a personal trainer; an owner and manager of a now-defunct "Phoenix-based lifestyle magazine" (*id.*); a nightclub manager; a pawn shop owner; an assistant vice president for a water delivery company; and a car salesman. Defendant argues that he is not a flight risk because of his substantial ties to Phoenix. In fact, defendant notes that his ties to Arizona and New York have strengthened because of his devout Judaism and his relationships with rabbis in both Phoenix and Buffalo. Finally, defendant argues that he does not constitute a danger to the community. Defendant rests his argument on "his lack of significant criminal record." (*Id.* at 9.) Specifically, defendant submits that his three known convictions[1] and four arrests while on bail mean that he "has minimal contact with

---

[1] Defendant's pretrial services report lists four different criminal cases with unreported dispositions, the most recent occurring in October 2011.

the criminal justice system and has never warranted [sic] on a criminal matter."
(*Id.* at 10.)

The Government opposes defendant's release in part based on the
evidence that it has accumulated while investigating him.  The Government notes
that the investigation began when Arizona law enforcement agents seized
approximately $299,590 from Buffalo resident Joseph Hughes.  Agents later
found out that Hughes traveled regularly between Buffalo and Phoenix to
purchase large quantities of cocaine and marijuana from defendant and others.
In July 2009, defendant and Hughes stayed in the Embassy Suites Hotel in
Buffalo at the same time, with defendant paying all of his hotel expenses in cash.
Around the same time, agents intercepted three mail packages in Arizona
destined for Buffalo that had approximately 100 pounds of marijuana in them and
that had defendant's fingerprints all over them.  Also around the same time,
defendant and another co-defendant began supplying a confidential informant
and others in Buffalo with hundreds of pounds of marijuana.  Defendant helped
arrange to ship crates from Arizona to Buffalo that sometimes contained over 500
pounds of marijuana.  In 2009 and 2010, the amount of marijuana shipped
exceeded 2,000 pounds.  The Oklahoma highway traffic stop occurred the
following February.  Since the issuance of the complaint, the Government has
added details that the trooper who stopped defendant also found a ledger in the
stopped vehicle listing money credits, debits, and other notations covering over

6

$2 million in monetary transactions.  After the traffic stop, defendant allegedly spent over $200,000 in cash leasing private planes to travel between Arizona and Buffalo between March 2010 and February 2011.  In January 2012, agents intercepted packages containing 80 pounds of marijuana destined for Buffalo from Arizona.  Finally, although the Government has not provided further details, it reports that an alleged co-conspirator in this case in turn has alleged that defendant has ties to a drug cartel in Mexico known as the Sinaloa cartel.

In further opposition to defendant's motion, the Government has cited to conduct by defendant that it believes is significant when considered with the evidence of the alleged drug operation.  In June 2011, defendant and a female companion attempted to cross the Rainbow Bridge in Niagara Falls without identification.  A secondary inspection revealed that defendant had eight cellular telephones in the car along with contact information for an informant in this case. Defendant explained to customs agents that he was a gold dealer who had one cellular telephone per customer and needed to collect money from the informant for a car sale.  The Government contends that the supposed car sale actually was a drug sale.  In February 2012, after being indicted, defendant hired his prior counsel from Arizona by paying him nearly $150,000 in one cash lump sum.  In Arizona, defendant allegedly loaned $100,000 cash to a car dealership in exchange for use of the dealership's vehicles.  Defendant later refused to provide any identification or paperwork in connection with the transaction.  The car

dealership ultimately canceled the loan transaction and paid off the balance owed by arranging for defendant and his girlfriend to receive approximately $41,000 in dental work.  Finally, the Government has obtained information indicating that, between 2007 and 2012, defendant spent over $153,000 gambling in Las Vegas.

The Government opposes defendant's motion also by citing to prior criminal conduct and to inconsistencies in the pretrial services report.  For example, according to the Government, defendant claims to have close family connections, but his mother did not know that he recently spent a year living in California, where she lives.  Defendant's mother also knew nothing about his substance abuse.  Defendant reported to the USPO that he uses marijuana daily, alcohol monthly, and MDMA and cocaine three times a year.  As another example of alleged discrepancies, defendant disclosed to the USPO only a modest income and $12,000 of assets despite evidence of much larger cash flows in his life.  As for criminal history, the pretrial services report does not report a final disposition for four of the defendant's prior criminal cases.  Nonetheless, defendant's known criminal history—all from Arizona—includes a 2005 conviction for third-degree criminal trespass; a 2005 drug conviction for conduct occurring while he was on bail; a 2005 drug arrest with unknown disposition that occurred while on bail; a 2010 assault arrest with unknown disposition; a 2010 conviction for possession of a canceled or false driver's license; a 2010 arrest for drug possession with unknown disposition that occurred while on bail; and a 2011

8

arrest for assault and other charges, also with unknown disposition, that also occurred while on bail.

The USPO recommends continued detention, citing numerous questions about defendant's resources including how a car salesman and former pawn shop owner can afford to pay an attorney $150,000 in cash. The USPO also cites concerns about defendant's criminal and drug history, his lack of ties to Western New York, and his failure to surrender himself in Arizona for this case after agreeing to do so.

## III.  DISCUSSION

"The Eighth Amendment to the Constitution states that '[e]xcessive bail shall not be required.'  U.S. Const. amend. VIII.  Consistent with this prohibition, 18 U.S.C. § 3142(b) requires a court to order the pre-trial release of a defendant on a personal recognizance bond 'unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'"  *U.S. v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).  Statutory factors to be considered when assessing flight or danger include the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  *See* 18 U.S.C. § 3142(g).

With respect to flight risk, "the government carries a dual burden in seeking pre-trial detention. First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." *Sabhnani*, 493 F.3d at 75 (citations omitted). "To order detention, the district court must find, after a hearing, that the government has established the defendant's dangerousness by clear and convincing evidence. The rules of evidence do not apply in a detention hearing. Further, the government may proceed by proffer." *U.S. v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) (citations omitted).

As a preliminary matter, the Court will address briefly an objection that defendant made at the detention hearing. Defendant objected to the Government's submission of evidence by proffer. Curiously, defendant cited the cases of *U.S. v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000), and *U.S. v. Martir*, 782 F.2d 1141 (2d Cir.1986), for the apparent proposition that the Government cannot offer evidence of defendant's alleged conduct unless it produces live witnesses who can undergo cross-examination. Defendant's objection contradicts the very cases that he cited. "It is well established in this circuit that proffers are permissible both in the bail determination and bail revocation contexts." *LaFontaine*, 210 F.3d at 130–31 (citations omitted). So long as courts take some

10

measure to assess the reliability and accuracy of prosecutors' information, "a detention hearing is not to serve as a mini-trial . . . or as a discovery tool for the defendant." *Martir*, 782 F.2d at 1145 (2d Cir. 1986) (citation omitted). The Court found the Government's proffer at the detention hearing to be reliable and accurate. Defendant gave the Court no evidence or reason to think otherwise. The Court thus has considered the Government's proffer for purposes of the pending motion, without infringing on the presumption of innocence regarding any ultimate disposition.

Having reviewed the papers and the presentations from both sides, the Court finds that the strength of the Government's case provides one basis for continued detention. The Government has presented abundant evidence—from intercepted mail packages containing defendant's fingerprints as well as from informants—that defendant has been running a massive, multimillion dollar drug operation. *Cf. U.S. v. Jackson*, 823 F.2d 4, 7 (2d Cir. 1987) ("As to the weight of the evidence, the government apparently has numerous informants as well as physical evidence to support its charges. Indeed, [defendant] has made no significant attack on the government's proffered evidence."). The alleged operation has triggered serious criminal charges and a presumption in favor of detention. The alleged operation also appears to have generated huge amounts of cash, as the ledger and cash seized at the Oklahoma traffic stop suggest. That cash, in turn, helps defendant live a furtive, yet extravagant lifestyle

11

commonly associated with organized crime and large-scale drug operations.

"Here, the inference of illegal activity raised by [defendant's] possession of a

large amount of cash must be considered along with the other evidence, including

his prior and subsequent arrests and convictions for the drug-related offenses.

Similarly, although 'profile' factors, such as the cash purchase of [travel-related

services], are of little value when considered in isolation, they are probative when

viewed along with other evidence of [drug] activity." *U.S. v. $8,880 In U.S.*

*Currency*, 945 F. Supp. 521, 526 (W.D.N.Y. 1996) (Larimer, *C.J.*) (citation

omitted). The transport of $671,385 in cash in a pickup truck, the hiring of a

lawyer with $150,000 in cash, and the agreement to $41,000 in dental work are

particularly stark examples of behavior by defendant that might seem odd by

themselves but probative in the context of 500-pound marijuana shipments. *Cf.*

*U.S. v. $37,780 In U.S. Currency*, 920 F.2d 159, 163 (2d Cir. 1990) ("[Defendant]

was carrying an extremely large sum of cash in small denominations,

demonstrating that he was either inordinately carefree with his money or was

involved in illegal activity."). Under these circumstances, and without infringing

on the presumption of innocence, the strength of the Government's case weighs

in favor of continued detention.

The extent to which defendant appears to be hiding information about his

finances implicates his character under 18 U.S.C. § 3142(g)(3)(A) and provides

another reason to continue detention. When the USPO interviewed defendant to

prepare the pretrial services report, he disclosed only $12,000 of assets, a sporadic employment history, and a monthly income nowhere near the cash flows that the Government has uncovered in its investigation. He did not explain why he drove around with $671,000 cash in his vehicle; why any legitimate gold dealer would buy eight different cellular telephones, each for only one client; or why he can spend hundreds of thousands of dollars in cash borrowing cars and private jets while insisting that no one document his transactions. The only explanation that defendant has attempted for his answers at the USPO interview is that he could not remember all of his financial details because he was nervous. That explanation is specious given the magnitude of concealment and given defendant's own insistence, in rebuttal to the Government assertion that he evaded law enforcement for a week before surrendering, that he spent time planning a voluntary surrender. If nothing else, were defendant and his counsel unable to prepare for the USPO interview during his plane ride to Buffalo to surrender? Defendant's decision to hide his financial information damages his credibility, as it suggests that he does not hesitate to tell both law enforcement and his own family only what he wants them to know about him. *Cf. U.S. v. Dellacroce*, 613 F. Supp. 312, 314 (E.D.N.Y. 1985) (granting pretrial detention where, *inter alia*, "[e]ven at his first appearance before Magistrate Kyle defendant continued to give evasive and untruthful answers as to a variety of matters, including the place where he lived both in New York and Florida."). Additionally,

13

defendant's concealment of his financial information raises serious concerns about his capacity to resume drug operations if the Court releases him under any combination of conditions. *See Jackson*, 823 F.2d at 7 (including "hidden assets" as a factor weighing in favor of detention).

Simply put, there is a significant chance that defendant still has unreported cash resources available at his disposal that he could use to resume his drug operations if released. Given the uncertainty that defendant himself has created, the Court has an obligation to protect the community by maintaining the only custody status that makes defendant's concealment irrelevant.

Defendant's community ties, substance use history, and criminal history are additional factors favoring detention. Defendant has no connection to Western New York except for the alleged offense conduct. Defendant has admitted to frequent substance abuse, and the Court can consider that information. *See* 18 U.S.C. § 3142(g)(3)(A) (listing "history relating to drug or alcohol abuse" among factors to consider); *U.S. v. Quartermaine*, 913 F.2d 910, 917 (11th Cir.1990) ("The [Bail Reform] Act [of 1984] specifically provides, however, for consideration of the accused's 'history relating to drug or alcohol abuse.'") (citing 18 U.S.C. § 3142(g)(3)(A)). Additionally, defendant has multiple prior convictions and arrests for drug and assault-related offenses. Of particular concern is defendant's history of arrests while on bail. *Cf. U.S. v. Ard*, No. 10-CR-184, 2011 WL 2421222, at *3 (W.D.N.Y. June 13, 2011) (Skretny, *C.J.*)

14

("Defendant's criminal history includes one arrest while under probation supervision and two arrests while released on bail, demonstrating that Defendant is unable to comply with conditions of release.").  Defendant committed those alleged bail violations while living with or near family, which means that emphasizing his family ties now has only limited value.  *Cf. U.S. v. Watson*, No. 4:08CR00655, 2008 WL 5411381, at *1 (E.D. Mo. Dec. 29, 2008) ("[T]he Court notes that Defendant resided with his mother for the majority of his life, during which time Defendant committed the offenses and repeatedly violated the terms of his probation and parole, as recited in the PSR.").  The Court finds from defendant's criminal history that defendant decides for himself when compliance with release conditions is necessary.  For this reason, the Court finds that continued detention is the only way to eliminate the risk of further bail violations that lead to non-appearance or a danger to the community.

In short, defendant has created for himself a history of prior criminal conduct and ongoing evasion that gives the Court no reason to trust the arguments that he has made in the pending motion.  The Court thus finds that defendant has not rebutted the statutory presumption in favor of detention.  The Court also finds by a preponderance of the evidence that defendant poses a risk of non-appearance, and finds by clear and convincing evidence that defendant poses a danger to the community.

**IV.    CONCLUSION**

For all of the foregoing reasons, the Court denies defendant's motion for bail (Dkt. No. 44).  Defendant shall remain in custody pending trial.

Defendant shall remain committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

Despite the Court's order of detention, defendant shall be afforded reasonable opportunity for private consultation with counsel.  Additionally, on order of the Court or on request of an attorney for the Government, the person in charge of the corrections facility in which defendant is confined shall deliver defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding in this case.

In accordance with 18 U.S.C. § 3142(j), nothing in this Decision and Order shall be construed as modifying or limiting the presumption of innocence.

SO ORDERED.

_/s/ Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: July 17, 2012

16